**NATIONAL INDIAN YOUTH COUNCIL, et al., Plaintiffs-Appellants,**

**v.**

**James G. WATT, Secretary of the Interior, et al., Defendants-Appellees,**

**Consolidation Coal Company and El Paso Natural Gas Company, Intervenors-Defendants-Appellees.**

No. 80–2097.

United States Court of Appeals, Tenth Circuit.

Argued Sept. 30, 1981.

Decided Nov. 12, 1981.

John J. Kelly, Albuquerque, N. M. (Luebben, Hughes & Kelly, Suedeen G. Kelly, Susan K. Tomita, Albuquerque, N. M., with him on the briefs), for plaintiffs-appellants.

D. Alan Rudlin, Richmond, Va. (Hunton & Williams, John J. Adams, Washington, D. C., Joseph M. Spivey, III, of Hunton & Williams, Richmond, Va., and Owen M. Lopez, Victor R. Ortega of Montgomery & Andrews, Santa Fe, N. M., with him on the brief), for intervenors-defendants-appellees.

Jerry Jackson, Washington, D. C. (Carol E. Dinkins, Asst. Atty. Gen., and Edward J. Shawaker, Atty., Dept. of Justice, Washington, D. C., with him on the brief), for federal defendants-appellees.

Before McWILLIAMS, BREITENSTEIN and McKAY, Circuit Judges.

BREITENSTEIN, Circuit Judge.

This appeal challenges the district court's action sustaining the approval by the Interior Department of a lease and plan for a surface mining, coal operation on the Navajo Reservation in New Mexico. The complaint alleges that the Department violated various federal statutes in granting its approval. The case was here earlier on appeal from the district court's denial of a preliminary injunction. We affirmed and remanded for trial on the merits. *National Indian Youth Council v. Andrus,* 10 Cir., 623 F.2d 694. After trial the district court made comprehensive findings of fact and conclusions of law in a published opinion, 501 F.Supp. 649, which denied a permanent injunction, and dismissed the action. We affirm.

The plaintiffs-appellants are the National Indian Youth Council, a non-profit organization, and several individual Navajo Indians. The defendants-appellees are the Secretary of the Department of the Interior (Interior), various officials of Interior, and the lessees Consolidation Coal Company and El Paso Natural Gas Company (together, ConPaso) which were permitted to intervene as defendants. The Navajo Nation (the Tribe), has not been joined as a party. The complaint sought both a declaratory judgment and injunctive relief. The record is voluminous and complex. The plaintiffs' attack centers on alleged non-compliance with the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 et seq.; The Surface Mining Control and Reclamation Act of 1977 (SMCRA), 30 U.S.C. § 1201 et seq.; the National Historic Preservation Act of 1966 (NHPA), 16 U.S.C. § 470 et seq.; and various regulations under those Acts.

I

The background of the present controversies is necessary to an understanding of the situation. Because of the repeated use of acronyms and technical terms a glossary is appended to this opinion.

In 1959 the Tribe granted a coal prospecting permit to El Paso Natural Gas covering

86,000 acres of land on the Burnham Chapter of the reservation. Between 1959 and 1968 the Tribe gave El Paso a lease and option to mine on lesser acreage but these were terminated without mining activity. In 1968 the Tribe, with Department approval, gave ConPaso a competitive lease on about 40,000 acres, the Burnham mine. The approval was before the passage of NEPA in 1969.

In 1973 ConPaso proposed the installation of two coal gasification projects on the leasehold. As required by NEPA the Bureau of Reclamation (BR) analyzed the environmental impacts of the proposed project, related surface mining operations, and alternatives. BR submitted its draft environmental statement, DES 74–77, to the Council on Environmental Quality (CEQ), to other federal and state agencies, and to the public in July, 1974.

ConPaso revised the project in 1975. One of the gasification plants was eliminated. The leasehold was divided into two distinct mining areas. Nine thousand acres, the Northern Mine, was to be used for the direct production and commercial sale of coal. The remaining acreage, the Southern Mine, was to supply coal to the gasification project to be located there.

In accordance with 25 C.F.R., Part 117, ConPaso, in December, 1975, submitted a Mining and Reclamation Plan (the 1975 Plan) to the United States Geological Survey (USGS), the Bureau of Indian Affairs (BIA), and the Tribe. The lease was renegotiated in 1976. This lease expanded the Tribe's control over project operations, instituted preferential hiring guarantees for Navajos, and imposed environmental protection guarantees to be followed by the lessees and administered by the Tribe and federal and state agencies. Under the renegotiated lease the Tribe will receive substantial financial benefits in the form of royalties. The new lease also protected the paleontological and archaeological resources of the leasehold.

After consideration of written comments on DES 74–77, and public hearings, BR issued its final environmental impact state-

ment, FES 77–03, on the renegotiated lease and the 1975 Plan. BIA prepared and circulated a draft impact statement. Following comments and public hearings, BIA in May, 1977, issued its final impact statement, FES 77–13. On August 31, 1977, the Secretary approved the renegotiated lease.

The Secretary's final approval of the 1975 Mining Plan was delayed by SMCRA. This Act created the Office of Surface Mining (OSM). The Secretary sent the 1975 Plan to OSM for review and recommendations. After OSM's study of the 1975 Plan, ConPaso submitted to OSM a restructured Mining and Reclamation Plan (the 1978 Mining Plan). The 1978 Plan was also sent to the Tribe, BIA, and New Mexico.

Both the Tribe and New Mexico approved the revised plan. BIA recommended approval. OSM issued, revised and reissued an Environmental Assessment (EA) which considered the two previously submitted impact statements and concluded that they adequately discussed the environmental impacts and that no supplemental impact statement was required by NEPA.

The recommended approval by OSM of the 1978 Mining Plan with stipulations was published in the Federal Register. After a 50-day comment period, the Assistant Secretary of the Interior issued a "Finding of No Significant Impact" (FONSI) on the basis of his review of the impact statements and EA. On January 11, 1980, the Secretary of the Interior gave final approval to the 1978 Mining Plan. Among other things, the stipulations limited for seven years the acreage available for mining and provided for protection of the environment and of paleontological and archaeological sites.

This suit was filed in the District of Columbia and transferred to the United States District Court for the District of New Mexico. In April, 1980, ConPaso notified the Tribe of its intent to begin mining operations. The plaintiffs sought and secured a temporary restraining order. It was vacated after a five-day hearing which resulted in the denial of a preliminary injunction. Plaintiffs then appealed to this court and moved for an injunction pending appeal.

We granted a temporary injunction, expedited the hearing, vacated our temporary order, and remanded for trial on the merits. In so doing we noted the finding of the trial court, 623 F.2d 694, 695, that:

"The first year of mining will produce 250,000 to 300,000 tons of coal and require disturbance of an eight-acre area. Fifty-seven (57) additional acres will be required for roads, sediment ponds, temporary spoil placement and facilities."

We also noted the lack of proof of harm to the individual plaintiffs, the substantial royalties which the Tribe will receive, the opportunities to Indians for employment, the energy problems confronting the United States, and the public interest in protection of the environment. Id. at 696. We said that the balancing of the interests should await decision on the merits. Id.

According to ConPaso's accounting, the proceedings which culminated in the Secretary's approval of the lease and mining plan involved 26 federal agencies or departments, nine New Mexico state agencies, 10 offices of the Navajo Tribe, and 16 environmental and public interest groups. See R. XX, Ex. 38. Plaintiffs do not challenge the count.

The first impact statement, DES 74–77, filled some 700 pages; the final BR statement, FES 77–03, had 800 pages plus appendices; the supplementing BIA statement, FES 77–13, contained 250 pages with appendices. The final EA of OSM was 86 pages in length and was accompanied by a 175 page Technical Analysis.

In denying plaintiffs' motion for an injunction pending appeal, the trial court on May 9, 1980, made 66 findings of fact and 10 conclusions of law, R. IV, p. 995 et seq. These fact findings were incorporated in the August 22, 1980, Memorandum Opinion dismissing the action. That opinion covers 56 typewritten pages. R. XXX, p. 111 et seq.; see also 501 F.Supp. 649–684. The record before us consists of 31 volumes of pleadings, exhibits, depositions, and transcripts. The mass of work which has been done on the project is impressive.

## II

▪ Judicial review of environmental impact statements has been discussed in many cases. Such statements are required when major federal action significantly affects the human environment. 42 U.S.C. § 4332(2)(C). The type of statement required depends upon the nature of the federal action proposed. *Kleppe v. Sierra Club*, 427 U.S. 390, 402, n. 14, 96 S.Ct. 2718, 2726, 49 L.Ed.2d 576; citing *Aberdeen & Rockfish R. Co. v. SCRAP*, 422 U.S. 289, 322, 95 S.Ct. 2336, 2356, 45 L.Ed.2d 191. The federal action here is the approval by the Secretary of the tribal lease of unallotted Indian Lands. This approval is required by 25 U.S.C. § 396a.

*National Helium Corporation v. Morton*, 10 Cir., 486 F.2d 995, 1001–1003, sets out the limits on judicial review of an environmental impact statement (EIS). We have consistently followed the *National Helium* decision. See e. g. *Environmental Defense Fund, Inc. v. Andrus*, 10 Cir., 619 F.2d 1368, 1374–1375; and *Manygoats v. Kleppe*, 10 Cir., 558 F.2d 556. The controlling principle is summarized in *Manygoats*, 558 F.2d 556 at 560, as being the application of the rule of reason to an EIS to see that it is "a good faith, objective, and reasonable presentation of the subject areas mandated by NEPA." Accord, *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227–228, 100 S.Ct. 497, 499–500, 62 L.Ed.2d 483, and *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460.

## III

▪ Plaintiffs say that Interior violated NEPA in failing to prepare a supplemental EIS on the proposed 1978 Mining Plan. They rely on 40 C.F.R. § 1502.9(c)(1). This regulation was promulgated by the Council on Environmental Quality (CEQ) which was created by NEPA to advise the President on environmental policy. See 42 U.S.C. § 4342. A 1970 Presidential Order authorized CEQ to issue "guidelines" for the preparation of statements on proposals affecting

the environment. See *Andrus v. Sierra Club*, 442 U.S. 347, 353 n. 10, 99 S.Ct. 2335, 2339, 60 L.Ed.2d 943. These guidelines were advisory. Id. at 356–357, 99 S.Ct. at 2341. A 1977 Presidential Order required CEQ to issue regulations for NEPA procedure. Id. at 357, 99 S.Ct. at 2341. The guidelines thus became mandatory. Id. at 357 and 358, 99 S.Ct. at 2341. The pertinent regulation provides, 40 C.F.R. § 1502.-9(c)(1), that, a supplemental impact statement shall be prepared:

> "if (i) the agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."

The attack is on FONSI, the January 11, 1980, "Finding of No Significant Impact." At the time of this finding Interior was provided with BR's final impact statement, FES 77–03, as supplemented by FES 77–13 of BIA, and the EA issued by OSM. ConPaso had by then proposed the 1978 Plan.

Plaintiffs argue that the rule of reason applicable to judicial review of agency action does not apply to a FONSI decision because that must be tested by the CEQ standards. Avoiding semantics, we take the regulations at their face value.

The CEQ regulations do not define "substantial changes." The district court said, 501 F.Supp. at 662, that "'substantial changes' must be ones for which there do not already exist formal EIS analysis and documentation." Plaintiffs say that the 1978 Plan makes a substantial change because it addresses mining activity only in the northern portion of the leasehold. The impact statements show consideration of environmental consequences in both the northern and southern segments. We have no reason to repeat the district court's detailed analysis and comparison of the original and final plans. See 501 F.Supp. at 663. Its findings sustain its conclusion that the acreage reduction of the 1978 Plan is not a substantial change.

The argument that the incorporation of various provisions for environmental protection makes a substantial change merits little consideration. In essence these provisions require that before mining may proceed on the larger segment of the northern area, the mining in the reduced tract for seven years must establish compliance with performance standards, enumerated by stipulation and set forth in SMCRA. See e. g. Stipulations 1, 2, 3, 4 and 22, R. XIX, Ex. 19. This is not a substantial change but the imposition of "continuing control on mining activities previously contemplated." 501 F.Supp. at 663.

The second CEQ test relates to "significant new circumstances or information." Plaintiffs contend that the passage of SMCRA is a significant new circumstance. OSM, the administrative agency created by SMCRA, studied and recommended approval of the 1978 Plan. We agree with the First Circuit that "a new statute or regulation clearly does not constitute a change in the proposed action or any 'information' in the relevant sense." *Concerned Citizens, etc. v. Secretary of Transportation*, 1 Cir., 641 F.2d 1, 6.

Plaintiffs assert that new information, relating to rehabilitating the land after the end of mining, has come to light. We recognize that reclamation and revegetation are integral to the project. The impact statements discuss the two problems in comprehensive detail. See e. g. FES 77–03 at § 16., 4., 4 and FES 77–13 at §§ 1., 4., 2., 2 and 1., 4., 2., 3; and generally § 3., 2. The agencies had available and considered a wealth of information bearing on the difficulty and uncertainty of reclamation. "If one term describes the high, dry country where mining is suggested the term is fragility." FES 77–03, § 3., 2 at p. 3.9.

The district court noted that for several years experimental reclamation had occurred at the Utah International Mine located near the site of the ConPaso mine. A plaintiffs' witness, familiar with the Utah International project, said that from the time artificial irrigation ended "success would need to be demonstrated in a period

of time of not less than 22 years in this particular geographic region." R. XIII, p. 62.

The EA issued by OSM devotes 16 pages to "Evaluation of Revegetation Potential," Supp. to App. pp. 145–150. In concluding that plant revegetation was possible if certain practices were used, OSM said: "Careful monitoring will be required to determine whether, in fact, cover will be maintained." Id. at 146. OSM said that significant effects on the environment were identified and discussed in the previous FESs. OSM proposed approval with stipulations. Id. at 79. The Plan contains appropriate stipulations to mandate monitoring. See Supp. to App. pp. 182–216.

The plaintiffs have failed to identify any specific, significant information generated after the 1977 FES statements. They show nothing more than the possibility that improved reclamation measures might be available at some unidentified time in the future. The issue must be decided on the basis of the record, not by crystal ball gazing.

Plaintiffs claim that new information was developed on paleontological and archaeological sites which showed need of action to preserve the sites before the start of mining operations. R. XXI, Ex. 13. The information on which plaintiffs rely does no more than confirm the number and significance of the sites discussed in the FESs. We conclude that the standards of the CEQ regulations were satisfied.

■ Plaintiffs contend that the impact statements are deficient because they failed to discuss the alternative of delay, pending revegetation information from nearby mines. Environmental impact statements must discuss alternatives to a proposed action. 42 U.S.C. § 4332(2)(C); see also CEQ regulation, 40 C.F.R. § 1502.2(e). As the district court observed, neither NEPA, nor any regulations, requires an agency to address delay as a specific alternative, 501 F.Supp. at 670–671. NEPA does not contemplate detailed discussion of remote and speculative alternatives. See *Environmental Defense Fund, Inc. v. Andrus*, 10 Cir.,

619 F.2d 1368, 1375, which says that the discussion of alternatives need not be "exhaustive" but must contain sufficient information to permit a "rule of reason" determination.

FES 77–03 discusses at length alternatives including deferral of the project. R. XVI, FES 77–03, Vol. 1, Chap. 8; see also the discussion in FES 77–13, Ch. XIII, pp. 8–1 to 8–6, and EA, Supp. to App., p. 81 et seq. The plaintiffs' emphasis on delay means an indefinite, long-term postponement of the project, the equivalent of project abandonment. The approval of the 1978 Mining Plan is conditioned on a showing at the end of seven years of a trend toward successful reclamation. Thus the project may go forward and new information obtained. This is sensible.

■ The requirement for discussion of alternatives is procedural. As said in *Stryker's Bay Neighborhood Council v. Karlen*, 444 U.S. 223, 227–228, 100 S.Ct. 497, 499–500, 62 L.Ed.2d 483:

" * * * once an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences; it cannot 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.' *Kleppe v. Sierra Club*, 427 U.S. 390, 410, n. 21 [96 S.Ct. 2718, 2730, 49 L.Ed.2d 576]."

See also *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460.

## IV

■ The purpose of the National Historic Preservation Act (NHPA), is the preservation of historic resources. Plaintiffs contend that defendants failed to comply with NHPA and regulations promulgated thereunder. The district court considered plaintiffs' NHPA claims at length, 501 F.Supp. at 674–680, and rejected their contentions. In their presentation to us, plaintiffs narrow the issue to one of timing.

Section 470f, 16 U.S.C., requires federal agencies "prior to the issuance of any license" to "take into account the effect of the undertaking on any * * * site * * * included in or eligible for inclusion in the National Register [of Historic Places]." Sections 470i and j create the Advisory Council on Historic Preservation (Council) and delegate to it the duties of advice, comment, and administration regarding historical preservation. Council regulations, 36 C.F.R. Part 800, prescribe procedural steps for a federal agency to follow in complying with NHPA.

■■■■ Under 36 C.F.R. § 800.4 the lead agency in a federal project has the responsibility for resource identification and protection. The lead agencies for the ConPaso project were BR, BIA, and USGS, whose duties under the regulations were non-delegable. Id. These duties were (1) consulting with the State Historical Preservation Officer (SHPO) with the right to require non-federal participation, (2) requesting a ruling from the Secretary of the Interior whether the archaeological sites on the project met the requirements of the National Register, and (3) securing comments from the Council, whose action could not be completed until the Secretary ruled on the sites. See § 800.4 and § 800.6. The Council's comments may be in the form of a Memorandum of Agreement executed by a lead agency official, the executive director of the Council, and SHPO. See § 800.-6(b)(6), (c)(1), and (c)(3).

In June, 1973, the Chief Archaeologist of the Museum of New Mexico conducted a preliminary archaeological survey of the leasehold. In late 1976 ConPaso proposed to secure archaeological, paleontological, and historical surveys by qualified personnel before any land disturbing activities. R. XXI, Ex. 19. SHPO reviewed the proposal, found that it satisfied the "applicable laws and regulations," R. XXI, Ex. 20, and sent his approval to BR. Id. The Navajo Nation's Cultural Resource Management Program (CRMP), and the Department of Geology of the Museum of Northern Arizona made intensive archaeological inventory surveys of the Northern Mine area and, in 1979, submitted their reports to National Park Service, NPS, whose assistance had been requested by USGS. The mentioned actions satisfied the consultation duty under § 800.4.

On the basis of the noted surveys, the Secretary of Interior has designated sites, under the National Register criteria, in the Northern Mine area. The timing problem asserted by plaintiffs is that the designations did not precede the comments of the Council. The site designations took place pursuant to stipulations in the Memorandum of Agreement executed by the required agencies and ConPaso in October, 1978. See R. XXI, Ex. 13. By signing this agreement with the Council before requesting site designations by the Secretary, the agencies technically failed to comply with the timing requirements of § 800.4(a)(4).

The technicality has no substantive effect on the protection and preservation of historic sites. The Council believed that its action was in accord with the statute and regulations. It wrote USGS on November 13, 1978, that the Memorandum Agreement contained the comments required by NHPA and the regulations. R. XXI, Ex. 21. See 36 C.F.R. § 800.6(c)(3). Stipulations in the agreement commit ConPaso to various protective measures and charge USGS with responsibility for assuring compliance. The Agreement says, R. XXI, Ex. 13:

"* * * the implementation of the undertaking in accordance with the following stipulations will avoid or satisfactorily mitigate the adverse effect on historic properties."

We are convinced that the Council and all other participating agencies made a good faith, objective, and reasonable effort to satisfy NHPA. The comprehensive protective measures should fully protect the historic sites.

Another timing argument of plaintiffs is that the Council action came after the approval of the 1976 lease, the submissions of FES 77–03 and FES 77–13, and the 1978 EA issued by OSM. Plaintiffs say that a complete survey of the leasehold and con-

sultation with the Council should have preceded the approval of the 1976 lease. Section 470f requires federal agencies to "take into account" the effect of a proposal on historic sites "prior to the issuance of any license." Neither NHPA nor the regulations define "license."

Although lease approval is necessary for mining on Tribal lands, no operations could have occurred until the approval of the Mining Plan under SMCRA and the pertinent regulations. See 25 C.F.R. § 177.7. Approval of the Mining Plan, not approval of the lease, is the federal action which might affect historic sites.

Study and evaluation of the ConPaso project went on for many years. The original proposal encompassed 40,000 acres. The approved mining operations for the first year were confined to eight acres plus 57 acres for needed facilities. The argument that a complete survey must be made of 40,000 acres before mining begins on eight acres borders on the absurd.

 The many agencies involved have patiently made exhaustive studies of the potential historical sites. The protective stipulations are adequate, reasonable, and enforceable. In *F. C. C. v. WNCN Listeners Guild*, 450 U.S. 582, 101 S.Ct. 1266, 1276, 67 L.Ed.2d 521, the Supreme Court repeated the statement in *Red Lion Broadcasting Co. v. F. C. C.*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371, that "the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong . . . ." The case at bar presents no compelling indications. We agree with the district court that the agencies' interpretations of NHPA and the regulations thereunder, and the application of both to the ConPaso project, are reasonable and proper.

### V

 Plaintiffs urge that the federal defendants have violated the NEPA requirement, 42 U.S.C. § 4332(1) that "the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter." The catch-all argument seems to be that the quoted provision imposes a duty separate from and additional to the preparation of an adequate environmental impact statement as required by § 4332(2)(C). We have held that the agency actions complied with NEPA, SMCRA, and NHPA. Taken together the two impact statements FES 77–03 and FES 77–13, of BR and BIA, the EA issued by OSM, and the memorandum agreement of the Council adequately inform the Secretary of the project's potential effect on the human environment.

The study of the project has covered both many years and many thousands of pages of paper. The various statements, assessments, stipulations, and agreements establish a comprehensive, good faith, objective, and reasonable presentation of the subject areas as mandated by NEPA and the other statutes with which we are concerned. The Secretary has the responsibility for balancing the many factors pertaining to the project. The court may set aside his decision "only for substantial procedural or substantive reasons as mandated by statute." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460. No such reasons exist in the instant case.

Affirmed.

### APPENDIX

### GLOSSARY

1—COUNCIL: The Advisory Council on Historic Preservation administers and interprets NHPA.

2—BIA: The Bureau of Indian Affairs.

3—BR: Bureau of Reclamation.

4—CEQ: The Council on Environmental Quality established by NEPA to advise the President on environmental policy matters.

5—CONPASO: A contraction of Consolidation Coal Company and El Paso Natural Gas Company, the lessees and project operators.

6—CRMP: The Cultural Resources Management Program of the Navajo Tribe involved in the protection of cultural resources on the Reservation.

7—CULTURAL RESOURCES: A generic term referring to archaeological, paleontological, and historic sites, either collectively or individually.

8—DES: Draft EIS.

9—EA: The Environmental Assessment prepared by OSM.

10—EIS: Environmental Impact Statement.

11—FES: Final Environmental Statement.

12—FONSI: The Finding of No Significant Impact made January 11, 1980, by the Assistant Secretary of Interior.

13—GASIFICATION: A process to produce gas from coal.

14—INTERIOR: The United States Department of the Interior.

15—1968 LEASE: By this lease the Tribe leased about 40,000 acres to ConPaso. No mining operations were conducted under it and it was superseded by the 1976 lease.

16—1976 LEASE: The August, 1976, lease which superseded 1975 lease.

17—1975 MINING PLAN: The Plan submitted by ConPaso in December, 1975, for mining on the entire leasehold.

18—1978 MINING PLAN: Also known as the "Restructured Mining and Reclamation Plan" this 3-volume document covered only the Northern Mine and was approved on January 11, 1980.

19—NATIONAL REGISTER: The National Register of Historic Places, the official list of districts, sites, buildings, structures, and objects determined to be significant in American history, architecture, archaeology, and culture. 36 C.F.R. Part 60. Once qualified and listed in the National Register, a site is provided certain protections.

20—NEPA: National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq.

21—NHPA: National Historic Preservation Act of 1966, 16 U.S.C. § 470 et seq.

22—NORTHERN MINE: The area approved for mining in the 1978 Mining Plan.

23—OSM: The Office of Surface Mining established by SMCRA.

24—SHPO: The New Mexico State Historic Preservation Officer.

25—SMCRA: The Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. § 1201 et seq.

26—TRIBE: The Navajo Tribe, also called the "Navajo Nation." The Tribe owns the Reservation on which the ConPaso mining project is located.

27—USGS: The United States Geological Survey.