LEAGUE OF WOMEN VOTERS OF TULSA, INC., a non-profit corporation, League of Women Voters of Oklahoma, Inc., a non-profit corporation, Patricia Laner, Sudye Neff Kirkpatrick, and Kathy Groshong, Plaintiffs-Appellees,

v.

The UNITED STATES CORPS OF ENGINEERS, Lieutenant General John W. Morris, Commanding Officer, United States Corps of Engineers, Colonel Anthony A. Smith, Commanding Officer, United States Corps of Engineers, Tulsa District, and Honorable John O. Marsh, Jr., Secretary of the Army, Defendants-Appellants,

City of Tulsa, Oklahoma, Amicus Curiae.

No. 81–1947.

United States Court of Appeals, Tenth Circuit.

March 14, 1984.

Martin W. Matzen, Atty., Dept. of Justice, Washington, D.C. (Carol E. Dinkins, Asst. Atty. Gen., Washington, D.C., Frank Keating, U.S. Atty., Hubert A. Marlow, Asst. U.S. Atty., Tulsa, Okl., Anne S. Almy, Atty., Dept. of Justice, Washington, D.C., with him on brief, Russell Petit, Atty., U.S. Army Corps of Engineers, Washington, D.C., James G. Dwen, Jr., Asst. Dist. Counsel, U.S. Army Corps of Engineers, Tulsa Dist., Tulsa, Okl., of counsel), for defendants-appellants.

Andrew T. Dalton, Jr., Tulsa, Okl. (James N. Khourie, Tulsa, Okl., with him on brief), for plaintiffs-appellees.

Neal E. McNeill, City Atty., Imogene Harris, Asst. City Atty., Tulsa, Okl., filed brief on behalf of amicus curiae City of Tulsa, Okl.

Before SETH, Chief Judge, and SEYMOUR and TIMBERS,* Circuit Judges.

* Honorable William H. Timbers, United States Senior Circuit Judge for the Second Circuit, sitting by designation.

SETH, Chief Judge.

The trial court held that the Corps-Tulsa final contract for water storage space in Oologah Reservoir and repayment of the City's share of cost was a major federal action requiring a full NEPA impact statement by the Corps of Engineers. The Corps takes this appeal and urges that there were no discretionary elements left as all the planning, contracting for space and construction had been completed, thus no decisions remained subject to NEPA.

The development of the Oologah Reservoir covers an extended period of time and the contract in issue comes at the very end. There were a long series of Congressional directives, statutes, construction work, contracts for storage space in the reservoir, agreements relating to the cost of the development, and construction by the City of pipeline and use of water by the City. Since the period is long and so much has gone before it seems best to list the events in sequence. Thus:

1950—A small Oologah Reservoir was authorized in the 1938 Act for flood control. This was followed by a period of drought and Tulsa became concerned about its future water needs. The City asked Congress to build a reservoir to provide water to the City at 200 million gallons per day.

Congress agreed to enlarge the Oologah Reservoir if Tulsa could obtain a water permit from the State of Oklahoma, and if the City would agree to repay a share of the cost. In response, the City obtained a state permit or allocation of water from Oologah Lake for municipal purposes (No. 54–517), and thus obtained a state "water right." The City entered into a contract with the Corps of Engineers to repay its share of the costs.

1955—Construction started on the Oologah Lake dam.

1956—The City and the Corps of Engineers negotiate a temporary water storage contract to store the water in the Oologah which had been allocated to the City by the State.

This agreement had a provision for cost recovery by the Corps.

Corps set aside 38,000 acre-feet of water storage space for the City. The Secretary of the Army approved the contract in March of 1958.

1958—Water Supply Act, 72 Stat. 319.

1961—The Tulsa-Corps contract was modified to meet the requirements of the Water Supply Act of 1958. The Water Supply Act requires the Corps to recover costs. The original contract (1956) contained a provision, which was not changed, that the parties would enter into a final contract when the development of the project was completed. This provision was as follows:

"It is the understanding and expectation of the parties hereto that upon change from the initial stage of development of the Project or upon expiration of the 50-year period ... the City shall have the prior right, subject to any required approval of appropriate State authorities, to negotiate a new contract for use of storage space then available for water supply purposes, with the new contract providing for appropriate modification in quantity, elevation and annual payment. The terms of the new contract shall be subject to mutual agreement at the time ...."

1962—The dam and the project are completed as a flood control device.

1963—Changes in Water Supply Act of 1958. Pub.L. 88–140 (1963).

The changes recite that they are applicable to dams already built or to be built and where the "local interests have acquired or may acquire rights to utilize certain storage space ... by making payments ... as specified in the agreement with the Government." (43 U.S.C. § 390d)

The changes refer to "local interests" which have contracted to repay the Corps the share of cost of facilities and provide that "their right to use [the facilities] may be continued during the existence of the facility as hereinafter ... provided." (43 U.S.C. § 390c)

The change states that the space "is hereby declared to be available to the local interest so long as the space designated for that purpose may be physically available." (43 U.S.C. § 390e)

The changes thus recognize the right to space for "local interests" so long as the reservoirs exist and so long as the cities make the payments.

Section 4 provides:

"Upon application of any affected local interest its existing lease or agreement with the Government will be revised to evidence the conversion of its rights to the use of the storage as prescribed in [this Act]." (43 U.S.C. § 390f)

1970—Construction of basic storage facilities at Oologah were completed.

1970—January 1, NEPA enacted.

1972—Final stage of development of the project starts.

1974—Tulsa asks Corps for final contract in accordance with above quoted provision in original agreement. *This is the contract in issue in these proceedings.*

1974—Water Resources Development Act of 1974 (88 Stat. 33) by Section 79 directs that the Oologah be available for municipal and industrial water supply pursuant to the Water Supply Act of 1958, 43 U.S.C. § 390b. This was an express directive by Congress that this project, already in existence, would be used for such water storage (Section 79). Thus:

"Sec. 79. The multi-purpose plan for the improvement of the Arkansas River and tributaries, authorized by the River and Harbor Act of July 24, 1946, as amended and modified, is hereby further amended to authorize the Secretary of the Army, acting through the Chief of Engineers, to reassign the storage provided in the Oologah Reservoir for hydroelectric power production to municipal and industrial water supply and to make such storage available for such purposes under the Water Supply Act of 1958, as amended."

Also the Senate Committee Report in Section 79 (S.Rep. 93–615, 93rd Cong. 1st Sess.

104 (1973), refers to the Oologah and it is therein stated:

"When the Oologah project was originally planned and constructed, the plan of improvement considered most practical included the future addition of power generating facilities, and storage was reserved for this purpose. However, since construction, the economic feasibility for the addition of hydroelectric power has declined while the demand for municipal and industrial water supply has steadily increased. This section recognizes this change in needs and modifies the project accordingly."

(The House Report makes a similar reference.)

1976—Corps of Engineers filed an Operational and Maintenance Environmental Impact Statement which described the use of the lake for water storage for municipal purposes, among other things.

February 4, 1977—This suit started.

During pendency of suit:

Tulsa voted bonds for pipeline from Oologah and right of way. Construction undertaken and pipeline completed in 1977.

City began to take water from lake on a regular basis pursuant to its state permit.

Trial court was aware of construction, development and water use by City.

City tendered payment to Corps for its share of construction costs.

November 1977—Trial court held that Corps should make a formal determination whether a significant environmental impact would result from the contract under NEPA.

Assessment filed in response to the court order which concluded that contract had no significant impact. Court rejected this conclusion and ordered that an impact statement be prepared. Corps filed notice of appeal. The League of Women Voters and the individual plaintiffs sought an injunction to stop the City from taking water from the reservoir. This was denied by the trial court which mentioned that other fed-

eral laws were involved. The plaintiffs and the trial court considered the contract as an event which required an examination of the entire project as if it was then beginning, and as if the Corps had water rights to allocate among users. Thus the League of Women Voters urges that alternatives to the project be considered, that delay should be considered as an alternative, that alternative uses for the water be discussed and alternative users be considered, among other things.

■ The Corps of Engineers is not involved with the distribution of water from the Oologah Reservoir, it has no water rights and no authority to allocate water among users as this is a state function, and it has no control over the water rights of others. Thus the Corps' contract with Tulsa must be very narrow in scope. It is for money and for storage space in the lake. The money part—the recovery of a share of costs—is required by statute. The storage had been long planned, decided and contracted for, and in any event represents a decision by Congress.

The significant developments started with Tulsa's recognition of future water needs (1950 to 1955), and its request for a reservoir to accommodate its future use of 200 million gallons per day. Congress agreed to enlarge the reservoir. This was the basic decision by Congress to design the project to at least accommodate the needs of Tulsa. Tulsa met the conditions— obtained water right from state and agreed to repay a share of costs. At that time the basic design, cost recovery, and use was decided. On this basis the construction of the dam started in 1955.

Thus the water was to be stored in Oologah Lake and Tulsa was to pay a share of construction costs. This, again, is all that the contract in issue covers. There are certain refinements and details, but nothing basic is different. There were also earlier formal contracts covering these elements and to accommodate changes in the statutes. There was also the early agreement to enter into a final contract, as the one in issue.

It is significant that the Water Supply Act of 1956 has remained the fundamental structure for this project and through the years has been modified to include and perhaps change the emphasis to provide storage of water for municipal and industrial use. But in any event, the Water Supply Act mandates cost recovery by the Corps from municipalities which have contracted for space and Tulsa is in this category.

The Water Resources Development Act of 1974 (Pub.L. No. 93–251, 88 Stat. 12) was legislation directing the use of facilities for municipal water storage, and by its legislative history, as referred to above, it is specifically directed to include such storage in the Oologah Reservoir.

■ Thus it must be concluded that the two subjects in the contract in issue—cost recovery and municipal water storage for Tulsa—are both directed or provided by Congress directly. NEPA does not apply to Congressional directives.

Another aspect of this appeal which should be mentioned is the construction work on the City's pipeline from the reservoir to its water treatment plant (the funds provided through a bond issue), the rights of way and the completion of the line and the taking of water on a regular basis. These events took place during the pendency of this suit with the knowledge of all concerned and with no objection.

With the completion of the dam before NEPA to accommodate water storage for Tulsa it is difficult to see how the contract in issue can be anything more than a memorial of the prior contracts and of the decisions that were made and executed in years past. It may also be regarded as an acknowledgment of the statutory directives. The contract is narrow in scope, as mentioned, and in our view does no more than forward the matters already decided or mandated.

■ Little need be said about the application of NEPA to this project as of the effective date of the Act (January 1, 1970).

The Act is not to be applied retroactively, but Congress intended it to be effective within reason as to ongoing projects. Thus the application must be made to major federal actions as to projects as the one here concerned when such actions constitute substantial changes, after January 1, 1970, in decisions theretofore made or in actions theretofore undertaken. There is however a balancing of possible cost/value consequences with the impact.

■ As we said in *National Helium Corp. v. Morton*, 455 F.2d 650, 656 (10th Cir.), "[T]he mandates of the NEPA pertain to procedure and do not undertake to control decision making within the departments." A decision already made in accordance with the procedural requirements of NEPA (which are the only requirements) or before the effective date of NEPA are not reopened for an examination of alternatives or anything else. *See National Indian Youth Council v. Watt*, 664 F.2d 220 (10th Cir.), and *National Helium Corp. v. Morton*, 455 F.2d 650 (10th Cir.). This is a significant factor in the case before us because the record demonstrates that all agency decisions of any significance had already been made by 1970. Whatever changes were made after that date were made by Congress, and even these as to Oologah were not major federal actions had they been made by the Corps. In *National Indian Youth Council v. Watt*, 664 F.2d 220 (10th Cir.), we considered an asserted change in a decision or action in a challenge to a finding of no significant impact. The conclusion there was that no new impact statement was needed or required under NEPA if the change was not significant.

■ It has been held that changes in statutes and in regulations do not constitute "changes" in this context. It is further established that the actions of Congress, as decisions or in directing or authorizing action, are not subject to NEPA. *See Environmental Defense Fund v. Froehlke*, 473 F.2d 346 (8th Cir.), and *Environmental Defense Fund v. Corps of Eng., U.S. Army*, 470 F.2d 289 (8th Cir.).

*In State of Kansas, ex rel. Stephan v. Adams*, 608 F.2d 861 (10th Cir.), we considered the "direct Congressional decision designing the basic rail system" concluding that design decisions were not left to the Secretary. We there said that there was no necessity to follow NEPA citing *Friends of the Earth v. Armstrong*, 485 F.2d 1 (10th Cir.), and said:

"We feel we have no problem of mere implied repeal of the procedural provisions of NEPA and the other statutes, but a direct Congressional decision designing the basic rail system, without the necessity of following those procedures."

As mentioned, this appeal concerns only the rejection by the trial court of the Corps of Engineers' decision that no further environmental impact statement was needed before the last of a series of storage contracts was signed. The Corps points to its Operational and Maintenance Impact Statement filed in 1976. This statement included a description of the use of the lake for water storage for municipalities, among other things. Also on this point the Corps argues that the contract for storage, the only action challenged, is not a major federal action as all decisions relating to the lake and to storage were made in the years before NEPA. We must agree.

In an examination of the rejection by the trial court of the Corps' finding of no significant impact by the execution of the storage contract, we apply the several decisions of this court relating to the standard of review of initial failures to consider impact statements, and of agency conclusions of no significant impact. The earlier cases were *Wyoming Outdoor Coordinating Council v. Butz*, 484 F.2d 1244 (10th Cir.), and *National Helium Corp. v. Morton*, 486 F.2d 995 (10th Cir.). There we set forth the standard to be used. In *Wyoming v. Butz*, which concerned a timber sale and a decision whether to proceed under § 102, we said:

"Of course, there must be a determination whether the statute applies and some area of judgment is involved. However, we are convinced that the com-

pass of the judgment to be made is narrow and that the determination must be reasonable in the light of the mandatory requirements and high standards set by the statute."

And:

"Under the specific terms of NEPA we feel that the proper standard, as stated earlier, is whether the negative determination was reasonable in the light of the mandatory requirements and high standards set by the statute so as to be 'in accordance with law'—another ground of review in § 706(2)(A) which may be applied consistently with the procedural demands of NEPA."

This standard was referred to in *National Helium Corp. v. Morton* in the opinion at 486 F.2d 995, 1001, where the court said as to the sufficiency of a statement:

"The trial court's conclusion that it was required by *Overton Park* to apply the arbitrary and capricious standard, was in our view, erroneous.

"The better reasoned decisions have required an objective good faith effort to comply with the statutory procedural requirements. Other than that, the courts have demanded that the agency do more than mechanically pursue the procedural standards."

*See also Environmental Defense Fund v. Andrus*, 619 F.2d 1368 (10th Cir.), and *Jette v. Bergland*, 579 F.2d 59 (10th Cir.). This standard was followed in *Jette v. Bergland*, where *National Helium* is quoted.

■ We must conclude applying the rule of reason set forth in the above cases that the contract in issue does not constitute a major federal action under NEPA. All decisions and actions as to the project and the subject of the contract had taken place long before NEPA was enacted. There were no significant changes after NEPA, and what changes that may have been brought about were by direct Congressional action. The agency conclusion that no significant impact would result from the execution of the contract must be accepted under the prevailing case law.

We must reverse the judgment of the trial court and remand with directions to dismiss the plaintiffs' complaints.

SEYMOUR, Circuit Judge, concurring.

I agree with the majority's holding that Tulsa is entitled to storage space by virtue of 43 U.S.C. §§ 390c–390f (1976). The Senate Report on the bill that became this statute stated:

"The purpose of H.R.1696 is to make the rights for storage space acquired by States or local interests in reservoirs constructed by the Corps of Engineers available to such agencies as long as the space designated for their purpose may be physically available. . . .

". . . .

"This legislation would apply to all contracts for use of water storage space contracted for by any local agencies in reservoirs constructed by the Corps of Engineers. . . .

". . . .

"The committee . . . believes that any local interests should have ample assurance that their rights will be continued at the end of the contract period, and that any existing contract may be revised to indicate the conversion of such rights if deemed advisable, subject to certain continued obligations in accordance with the provisions of the bill.

"The bill would define the equity of local interests in water supply storage in reservoir projects after the [contract] payout period . . . ."

S.Rep. No. 554, 88th Cong., 1st Sess., *reprinted in* 1963 U.S.Code Cong. & Ad. News 998, 999–1000. The Department of the Army construed the proposed legislation to "make permanent" the interest acquired by States or local agencies that had contracted to pay over a specified term of years for water storage space in Government projects. *Id.* 486 F.2d at 1001. I am thus persuaded that Tulsa acquired permanent rights in the reservoir storage space prior to the enactment of the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq. (1976) (NEPA). Having won

a preliminary injunction below on the ground that Tulsa was *not* contractually entitled to the storage space prior to NEPA, plaintiffs never developed an argument that NEPA would apply even if Tulsa were entitled to the space. Consequently, I concur in the reversal of the trial court's decision.

I write separately because I find confusing the majority opinion's statement on page 584 that NEPA does not apply to "the actions of Congress, as decisions or in directing or authorizing action." It is true that Congress may choose to exempt a given federal action from NEPA's requirements. *See, e.g., Izaak Walton League of America v. Marsh,* 655 F.2d 346, 367–68 (D.C.Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 630 (1981); *Navajo Tribe of Indians v. Andrus,* 644 F.2d 790, 791 (9th Cir.1981). In one of the cited cases, *Environmental Defense Fund, Inc. v. Froehlke,* 473 F.2d 346 (8th Cir.1972), the court recognized "that Congress has the right to *authorize* projects and to exempt them from the provisions of NEPA." *Id.* at 355 (emphasis in original). Congress has demonstrated its ability and willingness to do so expressly. *See, e.g., Navajo Tribe of Indians,* 644 F.2d at 791. If it wishes to so exempt a project, however, it must do so explicitly. The congressional policies set forth in NEPA itself require the courts to presume it applies absent specific statements by Congress to the contrary.

> "Given Congress' clearly expressed desire to ensure that all government actions are taken in accordance with NEPA, and its ability to expressly override the requirements of the Act, we believe that, even when substantive legislation is involved, repeal by implication should be found only in the rarest of circumstances. Absent very strong evidence in the legislative history demonstrating a congressional desire to repeal NEPA [in the context of a given project], or a direct contradiction between that Act and the new legislation, claims under NEPA should be reviewed."

*Izaak Walton League,* 655 F.2d at 367. *See also Committee for Nuclear Respon-* *sibility, Inc. v. Seaborg,* 463 F.2d 783, 785 (D.C.Cir.1971).

There is absolutely no suggestion that Congress had any intention at any time of exempting the negotiations related to this water storage contract from the requirements of NEPA. Consequently, I fail to see how *Froehlke* and *Environmental Defense Fund, Inc. v. Corps of Engineers,* 470 F.2d 289 (8th Cir.1972), *cert. denied,* 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973), apply here. I do not believe Congress exempted Oologah from NEPA application by authorizing its use for municipal storage, if that is what the majority is saying. As the Government readily concedes, an EIS would be required if the Oologah reservoir were being proposed for construction today. Brief for the Appellants at 18, 26. To my mind, NEPA is inapplicable not because Congress authorized the use of the reservoir for municipal storage, but because all relevant decisions were made and rights established prior to the effective date of NEPA.

I concur in the judgment in this case.