UNITED STATES of America,
Appellant,

v.

KANSAS PERSONAL COMMU-NICATIONS SERVICES,
LTD., Appellee.

In re Kansas Personal Communications Services, Ltd., Debtor.

Nos. 00–2392–JWL, 99–21747–11–JAR.

United States District Court,
D. Kansas.

Dec. 18, 2000.

Melanie D. Caro, Office of United States Attorney, Kansas City, KS, Margaret M. Newell, U.S. Department of Justice, Civil Division, Commercial Litigation, Washington, DC, for appellant.

Benjamin F. Mann, Blackwell, Sanders, Peper, Martin, LLP, Kansas City, MO, for appellee.

## MEMORANDUM & ORDER

LUNGSTRUM, District Judge.

This case involves complex issues at the intersection of administrative and bankruptcy law. It is representative of a national dispute involving the allocation of licenses by the federal government to providers of cellular telephone service which has spawned both litigation and Congressional attention. The matter comes before this court on the United States' appeal of the bankruptcy court's Memorandum Opinion and Order Denying Motion for Amendment of Schedules and Statements of Financial Affairs and to Strike Reference to PCS Licenses published as *In re Kansas Personal Communication Services, Ltd.*, 252 B.R. 179 (Bankr.D.Kan. 2000), and of the related Judgment on

Decision entered by the bankruptcy court on August 16, 2000. Although the court acknowledges the thoughtful and thorough consideration given to this matter by the bankruptcy court and that reasonable minds could disagree on the proper resolution of the issues presented, the order of the bankruptcy court and the related judgment are reversed because this court finds that the automatic stay upon filing a petition for bankruptcy did not apply to the cancellation of the licenses in question.

● **Background**

Kansas Personal Communications Services, Ltd. ("KPCS") was organized in 1994 for the purpose of acquiring licenses to use a portion of the radio spectrum to be auctioned by the Federal Communication Commission ("FCC") pursuant to 47 U.S.C. § 309(j). Section 309(j) authorizes the FCC to allocate licenses by auction. In 1996, KPCS submitted winning bids in an FCC auction and was issued three licenses. Because KPCS qualified under FCC regulations, KPCS was not required to pay the entire amount it bid for the licenses in one lump sum, but was allowed to make a down payment and promise to make subsequent installment payments to the FCC. On November 22, 1996, KPCS signed installment payment plans and security agreements for each of the three licenses. As collateral, the FCC took and perfected security interests in the three licenses. Pursuant to FCC regulations, the three licenses were granted subject to a condition that KPCS make timely and full payment of the amount of its winning bid, the failure of which results in automatic cancellation of the licenses. KPCS and the FCC later modified the installment payment plans, but retained the language requiring automatic cancellation for failure to make timely and full installment payments.

KPCS failed to make installment payments on the licenses due January 31, 1999. On July 19, 1999, an unsecured creditor of KPCS filed a petition to place KPCS in chapter 7 bankruptcy. On July 27, 1999, KPCS filed a motion to convert the bankruptcy to a chapter 11 reorganization and the bankruptcy court granted the motion on August 4, 1999. On July 31, 1999, all grace periods pertaining to the installment payments due January 31, 1999 expired. On February 14, 2000, the FCC filed a motion seeking an order from the bankruptcy court compelling KPCS to amend its schedule of assets to reflect that the three licenses automatically canceled on July 31, 1999. The bankruptcy court denied the motion and the FCC appeals to this court. On October 16, 2000, this court granted a motion by the FCC to stay the confirmation of the KPCS reorganization plan until this court enters judgment on the appeal.

● **Discussion**

■ In reviewing a bankruptcy court's decision, a district court reviews legal conclusions de novo. *In re Foster*, 188 F.3d 1259, 1264 (10th Cir.1999). The parties do not challenge any factual findings. Although the parties have raised and exhaustively briefed a number of issues, the question of whether the cancellation of the licenses was subject to the automatic stay in bankruptcy is dispositive.

● **Does the automatic stay of section 362(a)(3) apply?**

■ Section 362(a) provides for an automatic stay of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate" upon the filing of a bankruptcy petition. 11 U.S.C. § 362(a)(3). The bankruptcy court held that because of the automatic stay of section 362(a)(3), the three licenses "remain property of the bankruptcy estate." The court's decision was based on the premises that the licenses were property of the bankruptcy estate when the bankruptcy petition was filed and that the automatic cancellation of the licenses constituted an

"act" to exercise control over property of the estate.

■ "Property of the estate" is defined in section 541 of the Bankruptcy Code as "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541. A license to use part of the radio spectrum is a right granted by the FCC and is subject to conditions and restrictions imposed by the FCC. The FCC apparently acknowledges that a licensee holds a limited property interest in a license, see *In re Welch*, 3 F.C.C.R. 6502, 1988 WL 489137 (F.C.C. Oct. 21, 1988), and does not challenge the bankruptcy court's holding on this point.[1]

Whether the automatic stay of section 362(a)(3) applies, thus, turns on whether automatic cancellation constitutes an "act" by the FCC to obtain possession of or control over the licenses. In holding that cancellation of the licenses constitutes an "act" stayed by section 362(a)(3), the bankruptcy court focused on language in the FCC regulations providing that a licensee "will be declared in default" upon missing payments, language in the security agreement that the court read as giving the FCC "discretion and authority to choose its remedies in the event the licensee defaults," and an FCC decision allowing licensees to modify their installment payment plans. The bankruptcy court concluded that "the Licenses do not automatically cancel unless the FCC decides to utilize that remedy" and, therefore, "[c]ancellation of the Licenses is an act to exercise control over property of the estate"

that is stayed by section 362(a)(3). This court does not agree.

■ The FCC promulgated a number of regulations to implement Congress' instruction to allocate licenses through competitive auctions.[2] One of those regulations, 47 C.F.R. § 1.2110(d)(4)(iii), promulgated May 4, 1994, provided:

> Following expiration of any grace period without successful resumption of payment or upon denial of a grace period request, or upon default with no such request submitted, the license will automatically cancel and the Commission will initiate debt collection procedures pursuant to Part 1, Subpart O.

The section was subsequently amended and, at the time KPCS failed to make installment payments due January 31, 1999, the regulation, then found at 47 C.F.R. 1.2110(f)(4)(iv) (promulgated on April 8, 1998), provided:[3]

> Any eligible entity that submits an installment payment after the due date but fails to pay any late fee, interest or principal at the close of the 90–day nondelinquency period and subsequent automatic grace period, if such a grace period is available, will be declared in default, its license will automatically cancel, and will be subject to debt collection procedures.

■ A court "must give substantial deference to an agency's interpretation of its own regulations." *Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994).

---

1. A limited property interest of a licensee was also recognized by the Third Circuit in *In re Atlantic Business and Community Development Corporation*, 994 F.2d 1069, 1073–74 (3d Cir.1993) (interpreting a section of the Federal Communications Act as giving a licensee "rights akin to those created by a property interest limited only by the 'terms, conditions and periods of the license.' ").

2. Congress directed the FCC to "by regulation, establish a competitive biding methodology" and, in doing so, to promote certain objectives listed in the statute. 47 U.S.C. § 309(j). Where an agency receives an ex-

press delegation of legislative authority from Congress, such as this, the regulations promulgated by that agency "are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

3. The regulation remained unchanged when the grace period for KPCS installment payments due January 31, 1999 expired on July 31, 1999.

An agency's interpretation of its regulations must be given " 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.' " *Id.* (quoting *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945)). "Even if an agency's interpretation is not the only one permitted by the language of the rule, courts must respect it if it is at least a reasonable interpretation." *City of Aurora v. Hunt,* 749 F.2d 1457, 1462 (10th Cir.1984). "This broad deference is all the more warranted when, as here, the regulation concerns 'a complex and highly technical regulatory program,' in which the identification and classification of relevant 'criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.' " *Thomas Jefferson University,* 512 U.S. at 512, 114 S.Ct. 2381 (quoting *Pauley v. BethEnergy Mines, Inc.,* 501 U.S. 680, 697, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991)).

The FCC interprets the automatic cancellation provision of the regulations to be truly "automatic" and not require any FCC action:[4]

Nextwave argues that before there can be an automatic cancellation of a license, the Commission must "declare" that the licensee was in default under its payment obligations and that such a declaration was not made in this instance. The Commission did not contemplate a separate individual "declaration" to achieve "automatic" license cancellation ... to require that the Commission take affirmative steps to declare a license in default before the operation of the cancellation of the license would render the automatic nature of the process futile and meaningless. Nor, as explained above, have we followed the practice of issuing a separate declaration of default in prior cases.

*In re Public Notice DA 00–49 Auction of C and F Block Broadband PCS Licenses Nextwave Personal Communications, Inc. and Nextwave Partners, Inc. Petition for Reconsideration,* 2000 WL 1262652, ¶ 17 (F.C.C. Sept. 6, 2000). The FCC interpretation that licenses automatically cancel without any act by the FCC is not "plainly erroneous or inconsistent with the regulation" but is a reasonable interpretation.[5] The interpretation, therefore, must be given "controlling weight."[6]

Because FCC regulations dictate that the three KPCS licenses automatically cancelled and did not require the FCC to "act" to cancel the licenses, this court believes that the language of the security agreement is not relevant. Boilerplate language in the security agreement, standing alone, does not trump the plain mean-

---

**4.** Several licensees requested that the FCC waive the automatic cancellation (including Airadigm Communications, Inc., cited by KPCS) but the FCC has declined to grant waivers to individual licensees and reasserted that cancellation is automatic. *See Nextwave Petition for Reconsideration,* 2000 WL 1262652 at ¶ 15.

**5.** In fact, the plain language of the FCC regulations stating that a license "will automatically cancel" leaves little room for interpretation.

**6.** KPCS points out that deference is not due to what appears to be nothing more than a litigation tactic. *See Bowen v. Georgetown Univ. Hospital,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). Nothing here fits that category. The regulation providing for automatic cancellation was originally promulgated in 1994, well before this or other litigation

arose in bankruptcy courts touching on this issue. The FCC has consistently interpreted the regulation as not requiring any "act" by the agency to cancel the licenses. *See, e.g., Wireless Telecommunications Bureau Provides Guidance on Grace Period and Installment Payment Rules,* 13 F.C.C.R. 18,213, 1998 WL 639381 (F.C.C. Sept. 18, 1998) (explaining that upon failure to pay installment payments by the end of any grace period, "the license shall automatically cancel without further action by the Commission."); *In re Amendment of Pat 1 of the Commission's Rules—Competitive Bidding Procedures,* 13 F.C.C.R. 374, ¶ 107, 1997 WL 797529 (F.C.C. Dec. 18, 1997) (holding that the debtor "will be considered in default and its license will automatically cancel on August 30 without further action by the Commission.").

ing of the regulations and of the agency's long standing interpretation of them. Regardless of the language in the security agreement, the licenses automatically cancel pursuant to the regulations and no FCC action is necessary.

It is also not relevant, in this court's view, that in a series of Restructuring Orders the FCC suspended payments on certain licenses and allowed licensees to modify their installment payment plans. Significantly, these modifications were allowed for licensees not yet in default. *See In re Amendment of the Commission's Rules Regarding Installment Payment Financing for Personal Communications Services (PCS) Licensees*, 12 F.C.C.R. 16436, 1997 WL 643811 (F.C.C. Oct. 16 1997); *In re Nextwave Personal Communications*, 200 F.3d 43, 47 (2d Cir.1999). Because the modifications were allowed only for licensees not yet in default, the modifications are not an indication that the FCC must affirmatively act in order to cancel licenses which are in default pursuant to the "automatic cancellation" provision of the regulations.

While not directly on point, the court finds the *Gull Air* decision persuasive. In *In re Gull Air, Inc.*, 890 F.2d 1255 (1st Cir.1989), the First Circuit held that, despite filing a bankruptcy petition, an airline lost its right to use airport departure slots pursuant to an FAA regulation providing that an airline's rights to use the slots "shall be recalled by the FAA" upon failure of the airline to use the slots for a two month period. The court interpreted

the FAA regulation as not involving a discretionary decision by the FAA and concluded that the slots terminated "with no need for affirmative action by the FAA." *Id.* at 1261. Because the airline lost its interest in the slots "without any affirmative act of withdrawal" by the FAA, the court held that the automatic stay of section 362(a)(3) did not apply. *Id.* at 1262. Just as in *Gull Air*, the FCC did not need to take an affirmative act to cancel the licenses because the regulations did not give the FCC the option to cancel, but canceled the licenses automatically.[7]

Because the regulations mandate that a license automatically cancels and the FCC permissibly interprets the regulations to mean that no "act" by the FCC is required, this court concludes that the filing of the bankruptcy petition does not preserve a licensee's limited property interest in a license under the automatic stay of section 362(a)(3).[8]

● **Does the section 362(b)(4) exception to the automatic stay apply?**

The bankruptcy court also held that the exception to the automatic stay in section 362(b)(4) was inapplicable.[9] Section 362(b)(4) provides that a bankruptcy petition does not operate as a stay of an action by a governmental unit to enforce its "police and regulatory power." The bankruptcy court concluded that "the FCC's primary purpose is to protect its pecuniary interests" and "is not primarily to effectuate public policy." Consequently, the court held that "the FCC's attempted

---

7. The only argument advanced by KPCS to distinguish *Gull Air* is that "the FAA lacked discretion to do other than recall the slots." So too is the case with the FCC. The regulations do not present the FCC with an option to cancel the licenses once there is a default; the regulations themselves effect the cancellation.

8. The Tenth Circuit recognized an analogous principle under the former Bankruptcy Act. In *Trigg v. United States (In re Trigg)*, 630 F.2d 1370 (10th Cir.1980), the court found an automatic termination provision in an oil and gas

lease was not stayed by the filing of a bankruptcy petition.

9. In order to expedite full adjudication of this matter, and although the court's holding that the automatic stay does not constitute an "act" that is stayed by section 362(a)(3) would resolve the appeal before it, the court will also address the applicability of the section 362(b)(4) exception. The court concludes that even if the automatic stay is an "act" stayed by section 362(a)(3), the section 362(b)(4) exception to the automatic stay would be applicable.

cancellation of the licenses is stayed under § 362(a)(3) and not excepted from the stay by § 362(b)(4)." The court based its holding on the premise that the FCC is "effectuating public policy" when it requires an initial payment from a licensee but that the FCC is not effectuating public policy when it determines "how to deal with a licensee's default under the note and security agreement."

 The Tenth Circuit, in *Eddleman v. United States Dep't of Labor,* 923 F.2d 782, 790 (10th Cir.1991), explained the two tests that courts use to determine whether agency action fits the section 362(b)(4) exception. Under the "pecuniary purpose test," the court "asks whether the government's proceeding relates primarily to the protection of the government's pecuniary interest in the debtor's property and not to matters of public policy." *Id.* Under the "public policy test," the court "distinguishes between government proceedings aimed at effectuating public policy and those aimed at adjudicating private rights." *Id.* In *Eddleman,* the Tenth Circuit did not state a preference for either test but found that the agency proceedings in question in that case "exempt from the stay under either test." *Id.*

The regulation requiring cancellation is part of the administrative scheme that the FCC designed to implement the auction system and meet the objectives that Congress set out in the statute. Congress directed the FCC to "create an efficient regulatory regime based on the Congressional determination that competitive bidding is the most effective way of allocating resources to their most productive uses." *Nextwave,* 200 F.3d at 52. According to the FCC, the requirement for timely installment payments is essential to this regulatory scheme:

Strict enforcement of payment rules enhance the integrity of the auction and licensing process by ensuring that the applicants have the necessary financial qualifications and that the spectrum is awarded to those qualified bidders who value the spectrum the most. Insisting that licensees demonstrate their ability to pay as a condition to holding licenses is essential to a fair and efficient licensing process ...

*Nextwave Petition for Reconsideration,* 2000 WL 1262652 at ¶ 25.

FCC regulations award licenses to bidders with "the highest willingness to pay" in the belief that this "tends to promote the development and rapid deployment of new services in each area and the efficient and intensive use of the spectrum." *In re Implementation of Section 309(j) of the Communications Act—Competitive Bidding,* 9 F.C.C.R. 2348, ¶ 70, 1994 WL 412167 (F.C.C. March 8, 1994); *Nextwave,* 200 F.3d at 52.[10] The FCC exercised its delegated authority and decided to measure which bidder had "the highest willingness to pay" by considering both the highest auction bid and whether the bidder subsequently makes timely and full installment payments. *See Nextwave Petition for Reconsideration,* 2000 WL 1262652 at ¶ 20; *In re Nextwave Personal Communications Commission,* 217 F.3d 125, 135–36 (2d Cir.2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 606, —— L.Ed.2d ——, 2000 WL 1377133 (U.S. Nov. 27, 2000). "[T]he Commission's requirement of full and timely payment has an essential regulatory purpose—as an indication that the winning bidder is and continues to be financially able to meet its obligations on the license and intends to use the license for providing services to the public." Priv. Ltr. Rul., DA 00–1791, 2000 WL 1114286 (FCC Aug. 7, 2000).[11]

---

**10.** The FCC believes that "awarding licenses to those parties who value them most highly will foster the statutory policy objectives." *In re Rulemaking to Amend Parts 1, 2, 21, and 25 of the Commission's Rules to Redesignate the 27.5—29.5 GHZ Frequency Band, to Reallocate* the 29.5—30.0 GHZ Frequency Band, 11 F.C.C.R. 53, ¶ 137, 1995 WL 447411 (F.C.C. July 13, 1995).

**11.** The FCC rejects the suggestion that section 309(j) directs the agency to "maximize auc-

It is not the role of a court to second guess the FCC's regulatory scheme and hold that the statutory objectives are not furthered by requiring timely and full installment payments. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Such a policy decision lies in the discretion of the FCC, as delegated by Congress, and a court must respect the decision unless it is "arbitrary, capricious, or manifestly contrary to the statute." *Id.* The FCC policy decision that the statutory objectives are furthered by automatic license cancellation for failure of a licensee to make timely and full installment payments is not arbitrary, capricious or contrary to the statute, and must be respected by this court. Automatic cancellation, therefore, does not relate "primarily to the protection of the government's pecuniary interest" nor is it aimed at "adjudicating private rights." Under the Tenth Circuit's tests, the section 362(b)(4) exception to the automatic stay is applicable.[12] *See also, Yellow Cab Cooperative Ass'n v. Metro Taxi, Inc.,* 132 F.3d 591 (10th Cir.1997) (applying the Tenth Circuit's tests and holding that a decision by the Colorado Public Utility Commission denying the transfer of taxi cab operating certificates effectuated public policy and not the agency's pecuniary interest).

IT IS THEREFORE ORDERED BY THE COURT THAT the order of the bankruptcy court and the related judgment are reversed.

---

tion revenue" and interprets the statute as instruction to create a regulatory system to "encourage the rapid deployment of service" and "efficient use of the spectrum." *In re Implementation of Section 309(j) of the Communications Act—Competitive Bidding,* 9 F.C.C.R. 2348, ¶ 73, 1994 WL 412167 (F.C.C. March 8, 1994).

12. In its brief on appeal, KPCS argues that attempts by the FCC to persuade Congress to enact specific statutory language to exempt debts owed to the FCC from the jurisdiction of the bankruptcy courts "reveal that Congress intends for the FCC and its collection efforts to be subject to the provisions of the Bankruptcy Code, and that the police-power exception to the automatic stay contained in 11 U.S.C. § 362(b)(4) does not apply to the FCC's collection efforts." Evidence of failed FCC lobbying of Congress is not evidence of

the meaning of section 309(j). The FCC certainly is entitled to seek legislative clarification on a point so it will not be required to relitigate circuit to circuit. Moreover, the lobbying efforts were directed at a different Congress than the one that passed the law in question and the fact Congress decided not to act tells us neither the reason for Congressional inaction nor what Congress intended when it acted in the first place. *See United States v. Southwestern Cable Co.,* 392 U.S. 157, 170, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968) ("[T]he views of one Congress as to the construction of a statute adopted many years before by another Congress have 'very little, if any, significance.' Further, it is far from clear that Congress believed, as it considered these requests for legislation, that the Commission did not already possess regulatory authority over [the matter].").