George BUNCH, Dorothy Bunch, Jamie Hamilton, Bonnie Hamilton, Dare Hayes, James E. Naifeh, Buddy Wade Moore, Terry L. Hopper, Tommy Yarbro, Joe Parker, and Louis Hornsby, Plaintiffs,

v.

Donald HODEL, Individually, and as Secretary of the Department of the Interior of the United States of America, Gary T. Myers, Individually, and as Executive Director of the Tennessee Wildlife Resources Agency, and Larry E. Nunn, John D. Graham, Les Hill, Johnny Bellis, Jim Carmichel, Norma Crow, Charles A. Howell, III, Tommy Knowles, Frank Madlinger, and Charles Peavyhouse, Commissioners of the Tennessee Wildlife Resources Agency, Defendants.

No. 85–1110.

United States District Court,
W.D. Tennessee, E.D.

July 9, 1985.

See also 6th Cir., 793 F.2d 129.

Alf Adams, Jr., Adams, Taylor, Philbin, Pigue and Marchetti, C. Kinian Cosner, Jr., Cosner and Waldschmidt, Nashville, Tenn., Edward E. Hall, Brentwood, Tenn., for plaintiffs.

Mary Walker, Michael Peragin, Asst. Attys. Gen., Nashville, Tenn., Robert M. Williams, Asst. U.S. Atty., Memphis, Tenn., for defendants.

HORTON, District Judge.

In this lawsuit, the Court has been asked to resolve a controversial environmental issue centering on Reelfoot Lake and the national wildlife refuge located there. Plaintiffs seek an order from this Court enjoining the defendants, the State of Tennessee and the United States from proceeding further with a very controversial drawdown of water 5.8 feet below normal pool level at Reelfoot Lake. It is the position of the plaintiffs, which is denied by the state and federal defendants, that this drawdown of water is a major federal action and this requires an environmental impact study before it can be undertaken. For reasons stated in this opinion, the Court grants the injunction and will, simultaneously with the filing of this opinion, file an appropriate injunction order.

Throughout the four day trial of this lawsuit, the Court was presented with myriad theories concerning what this lawsuit is all about. The parties all seemed to agree the central issue is whether the drawdown as undertaken is a major federal action. The plaintiffs say yes. The defendants say no. For purposes of clearly presenting the Court's views in this opinion, the Court will state what, in its opinion, this lawsuit is not about.

This lawsuit is not about the establishment of a new federal project on Reelfoot Lake. Facts surrounding the issues litigated appear to have been presented as if the drawdown of 5.8 feet of water in and of itself is the whole project. This is certainly not established by the facts. The Reelfoot Wildlife Refuge has been developed over more than 40 years on Reelfoot Lake. Therefore, this lawsuit is not just about an issue over the drawdown of 5.8 feet of water at Reelfoot Lake. It is, in fact, an issue over a drawdown of water at Reelfoot Lake in the historic context of a major federal undertaking, that is, the establishment and maintenance of a wildlife refuge on more than 7,000 acres of land and water at Reelfoot Lake, which has been developed over more than 40 years.

The issue in this lawsuit relates not just to the fact that no federal funds were utilized in the planning of the drawdown of 5.8 feet of water at Reelfoot Lake by the State of Tennessee. The fact is federal funds have been appropriated and utilized over many years to develop the Reelfoot Wildlife Refuge. There has been a federal presence at Reelfoot Lake for many years in terms of funds, personnel, equipment and authority. This federal presence at Reelfoot Lake has been and is a continuous and ongoing presence.

This is not a lawsuit about a small wildlife refuge. Reelfoot contains a large and expansive federal wildlife refuge covering more than 7,000 acres of land and water. Because of its purpose and the function it serves, Reelfoot Wildlife Refuge is not just a local refuge but, rather, because of its significance, a national wildlife refuge.

The issue in this lawsuit, therefore, is not simply whether the limited federal participation in the state's drawdown of 5.8 feet of water at Reelfoot is a major federal action. Instead, the issue is whether the federal government's acquiescence in the state's water drawdown project and actual physical relinquishment of its possession to the state of the mechanisms (key and crank) necessary to control the water pool level, acts of the federal government constituting what appears to be an abdication of its duties under the August 28, 1941, lease agreement and its duties and responsibilities under the federal Migratory Bird Conservation Act, can be characterized as a major federal action.

The Court rules that acting within this context of more than 40 years of federal action, the Federal government's inaction, when it has a continuing and an ongoing legal duty to act, and its acquiescence in the drawdown project constitutes major federal action.

Because the Court finds, based upon the entire record in this lawsuit, a major federal action, and this action, conceded by the state, will have a significant impact on the human environment, the state's drawdown of 5.8 feet of water at Reelfoot Lake must stop. The drawdown cannot proceed further. The Court finds an environmental impact statement must be prepared in accordance with the National Environmental Policy Act, which is popularly referred to by the acronym NEPA.

Issues explored in this lawsuit arise out of a lease agreement dated August 28, 1941, in which the State of Tennessee leased to the United States 7,606.84 acres, more or less, of lands and water at Reelfoot Lake from August 28, 1941, until August, 2016, a period of 75 years. The state of Tennessee claims the lease is in some respects ambiguous and perhaps has been reformed by practice and custom, something akin to a novation. The Court has read and reread the lease and does not find any ambiguity in it.

The lease was executed by Governor Prentice Cooper, Joe C. Carr, Secretary of State, Robert W. Lane, Comptroller of Tennessee and R.C. Donaldson and Edward Parks, then members of the Reelfoot Lake Commission, all for the State of Tennessee. The lease was executed by Ira N. Gabrielson, Director of the Fish and Wildlife Service of the United States Department of the Interior. It is reasonable for the Court to conclude these officials, acting for their respective governments, found no ambiguity in this lease.

Thirty-two (32) years later, on April 10, 1973, the State of Tennessee and the United States reaffirmed the August 28, 1941, lease. On that date, April 10, 1973, Governor Winfield Dunn and the Attorney General of the State of Tennessee approved the action of the Director of the Tennessee Game and Fish Commission specifying the metes and bounds description of the lands and waters covered by the August 28, 1941, lease. The federal government's Bureau of Sport Fisheries and Wildlife had noted its approval on April 4, 1973.

This Court finds it significant that Governor Winfield Dunn and the state's then Attorney General apparently discovered no ambiguity in this lease of lands and waters to the United States—even after more than thirty (30) years of experience with the

lease. Similarly, this Court finds no ambiguity in the lease. The lease and its supplements are well crafted legal documents.

The Court will now turn to an analysis of the August 28, 1941 lease.

At some point prior to February 11, 1941, the Reelfoot Lake Commission of the State of Tennessee had determined that

development for an environment most suitable for migratory birds, other desirable bird species, fur bearing animals and fish and of a refuge or refuges for migratory birds within the areas of the state's property at Reelfoot Lake would be of paramount benefit to the people of the State of Tennessee and of the United States.

On February 11, 1941, the General Assembly of the State of Tennessee authorized the Reelfoot Lake Commission (Commission) to convey or lease to the United States of America, Department of the Interior, Fish and Wildlife Service (Service) any or all of the state's property at Reelfoot Lake in Obion and Lake Counties, Tennessee, including so much of the water on the lake as may be determined appropriate to

develop a wildlife refuge or refuges within the areas of the state's property at Reelfoot Lake and carrying out wildlife management practices thereon or therein.

On August 28, 1941, pursuant to the authorization of the General Assembly, Chapter 48 of the Public Acts of 1941, the Commission, acting on behalf of the State of Tennessee, entered into a lease agreement with the United States of America, Department of the Interior, Fish and Wildlife Service, in which the State of Tennessee leased to the United States 7,606.84 acres, more or less, lands and waters at Reelfoot Lake from August 28, 1941, to August, 2016:

(a) For the purposes of carrying out the provisions of the Migratory Bird Conservation Act of February 18, 1929, (45 Stat. 1222), as amended, including but not limited to the construction and maintenance of such dams, dikes, ditches, flumes, spillways, buildings and other improvements as are necessary to accomplish the purposes of this Agreement, all those tracts of land owned by the State of Tennessee and designated generally on the plat attached hereto and made a part hereof, the exact boundaries thereof to be located on the ground in accordance with a survey to be made by the Service.

(b) For the purpose of flooding and impounding water thereon, including the right to discharge thereon any water which may have been impounded on the area described in paragraph (a) above, and for the purpose of doing thereon such cooperative work and other operations as the Service and the Department of Conservation of the State of Tennessee may jointly determine and agree are necessary and needful in order to accomplish and make effective the purpose of this agreement and to make Reelfoot Lake in its entirety a better wildlife and recreational area, including the cleaning and removing or destroying of obnoxious vegetation growing thereon, so as to create and permit the maintenance of clear channels of water flowing, impounded or retained thereon, all those tracts of land owned by the State of Tennessee and designated generally on the plat attached hereto and made a part hereof, the exact boundaries thereof to be located on the ground in accordance with a survey to be made by the Service.

The State of Tennessee specifically reserved, and the lease is subject to, two exceptions and conditions:

This lease is specifically made subject to the following exceptions and conditions:

1. That as to all of the areas described in this instrument, there is reserved to the State of Tennessee for the benefit of the residents, the right to fish with hook and line, including the use of either natural or artificial bait in connection therewith in said Lake during open seasons prescribed by laws and regulations of the State of Tennessee: *Provided,* That persons fishing within the areas described in paragraph (a) above shall

comply with the regulations of the Secretary of the Interior covering the use of such area as a refuge.

2. That as to all of the areas described in this instrument there is reserved to the State of Tennessee the right to prescribe and collect such fees for public hunting and fishing thereon as it may deem appropriate, but such right to prescribe and collect such fees shall not be construed as a reservation of the right to interfere in any manner with the rights of the Service to administer and protect the areas described in paragraph (a) above as a refuge and to regulate the extent of hunting and fishing thereon in accordance with its general powers and duties under the provisions of the Migratory Bird Conservation Act or under the provisions of any other law applicable thereto.

The United States, acting through the Department of the Interior, Fish and Wildlife Service, accepted certain restrictions and duties as its obligations under the lease:

3. That the Commission does not warrant title to any of the areas described herein nor does it assume any liability for damage to privately owned lands or buildings by reason of the operations of the Service under the provisions of this lease.

4. That the Service, in operating and maintaining the dam located at the south end of Reelfoot Lake for the purpose of impounding and retaining on the property described in paragraph (b) above such water as may flow naturally on to said lands or may be flowed thereon by the Service, shall not at any time raise artificially the water level in any pool or reservoir created on said Lake more than Three (3) feet above the present spillway level or lower artificially the water level more than Three (3) feet below the present spillway level: *Provided,* That the Service may temporarily drain a sufficient part of the water found or impounded on all of the areas described herein for the purpose of cleaning and removing or destroying obnoxious plant or animal life growing in said Lake, with the written permission of the Commissioner of Conservation of the State of Tennessee, or his successors, approved by the Governor of Tennessee, *Provided further,* that during no season of the year may the waters of the Lake be entirely drained.

5. That the Service shall maintain and operate, during the term of this lease, the dams and spillways, together with any other appurtenant structures that may be reconstructed or constructed at or near the present location of the dams and spillways located at the south end of Reelfoot Lake.

6. That the Service shall cut or otherwise remove obnoxious vegetation from a number of channels throughout the area described in paragraph (a) above, sufficient to permit, during the term of this lease, (1) the free circulation of water, (2) free passage of fishing boats, and (3) the maintenance of the areas as resting, nesting, and feeding ground for migratory waterfowl and other wildlife, and (4) the Service shall take such steps as it deems necessary and practical to control siltation of Reelfoot Lake through the construction and maintenance of silt basins and erosion control works on the area described in paragraph (a) above.

7. That the Service shall maintain, during the term of this lease, the area described in paragraph (a) above as a refuge for migratory waterfowl and other wildlife in accordance with its general administration powers and duties, and in accordance with the migratory Bird Conservation Act of February 18, 1929, (45 Stat., 12–22), and in accordance with the purposes of this Agreement.

8. That all rights granted under this instrument may be terminated by execution order of the Governor of Tennessee in the event (1) the area described in paragraph (a) above is not maintained as a refuge for Migratory waterfowl and other wildlife in accordance with the established policies of the Service, and the provisions of the Migratory Bird Conser-

vation Act of February 18, 1929, (45 Stat., 12–22), for a period of any one fiscal year; or (2) the use of the area described in paragraph (a) above as a refuge is abandoned.

The lease provided that if funds were not available for the necessary expenditures to execute the agreement the United States and the State of Tennessee would be released from liability in connection with the lease:

The acceptance of this agreement by the Service and the State of Tennessee is made contingent on the availability of funds for expenditures hereunder. In case such funds as may be necessary to carry out any of the terms or conditions of this agreement are not made available, the United States of America and the State of Tennessee is released from all liability in connection therewith.

The Department of the Interior, Fish and Wildlife Service, established the Reelfoot Wildlife Refuge and that refuge has been in existence for approximately 44 years. The August 28, 1941, lease provided, among other things, that upon completion of surveys there should be prepared a supplement to the lease that would set forth in detail a precise description of the boundaries of lands and waters that were identified only generally in the original lease.

On April 10, 1983, about 32 years after the August 28, 1941, lease, the State of Tennessee, acting through the Director, Game and Fish Commission, pursuant to an Act of the Legislature (Sec. 51–607, Tenn. Code Ann.), executed the lease supplement specifying the boundaries of lands and waters covered by the terms and conditions of the August 28, 1941, lease. The United States, acting through the Regional Director, Bureau of Sport Fisheries and Wildlife signed the lease on April 4, 1973. The Lease Supplement specifies that an aggregate of 7,606.84 acres, more or less, are leased to the United States.

The Court reiterates that a plain unconvoluted reading of this lease discloses no ambiguity whatsoever. The lease is a well crafted and binding legal document.

The facts in evidence show the parties to this lease, the State of Tennessee and the United States, have acted over the years in a way demonstrating that control over the water pool level at Reelfoot Lake rested with the United States. In every instance up to the time of this drawdown project the state, if it wished to manipulate the water pool level, sought permission from the United States. The testimony is this permission was obtained from the Atlanta Regional Office of the Department of the Interior. The County Executive of Lake County, Tennessee, Judge James E. Naifeh, testified the state obtained permission from the United States to lower the water pool level in order to begin the construction of a much needed sewer system at Reelfoot Lake. When the water level was manipulated, it was not done by state personnel— but rather, by federal personnel. Yet, after approximately 44 years, when the state decided upon the drawdown, the Regional Director from the Department of the Interior, Mr. Pulliam, testified he instructed his personnel at Reelfoot to give the state officials the key and the crank used to control the water pool level. The state used the key and the crank to begin the drawdown. This was the only time it has ever done so. When questioned along this line, Mr. Pulliam testified, in substance, that the past practices were ancient history as he does not do business that way anymore. The Court finds that ancient history shows a pattern and course of conduct indicative of how the parties to the lease interpreted its provisions, that is, only the federal government controlled the water pool level of Reelfoot Lake. The State of Tennessee went to the United States. The United States decided and acted upon its decision.

When this drawdown was planned and undertaken, apparently things were different. The state decided to act and did act. Apparently, the United States threw in the towel, kind of rolled over and played dead. Obviously, the United States recognized a new authority at Reelfoot Lake. This is clearly shown by the testimony of Wendell Crews, the federal official in charge of the

wildlife refuge. Mr. Crews testified as follows:

WENDELL CREWS,

after first being duly sworn, was examined and testified as follows:

\* \* \*

CROSS EXAMINATION

BY MR. PEARIGEN:

Q. What were the Service's conclusions with respect to the drawdown on the Service's Waterfowl Management Plan of the lake?

A. We thought that there could be some short-term adverse effects, but we didn't think it would be overwhelming or irreversible. And that—well, we recognized the fact that some 60 to 80 percent of the total refuge users or lake users is geared toward sports fishing. And we kind of took the attitude, if it would help the sport fishing as much as the TWRA said that it would and believed that it would, then, well, we would be willing to take a short-term loss in the waterfowl management program for the benefit of the majority of the lake users.

BY THE COURT:

Q. You made a statement about a response to a question on whether you, or you or the Federal Government, approved the State's drawdown for the purposes here. And what did you say again? You said that you thought there would be a short-term adverse effect, but probably, now these are my words summarizing what I thought you said, that there would be a short-term adverse effect, but no overwhelming adverse effect for the long-term, and if it would help the sport fishing as much as TWRA said, we would be willing to take a short-term adverse effect. Now, did I hear you correctly?

A. Yes, sir.

Q. If I didn't, tell me now.

A. Basically what you are saying is what I did attempt to say, and I could elaborate or try to clarify that a little if Your Honor wishes.

Q. Would you do so.

A. All right. Of course, our primary concern, as a federal agency at Reelfoot, is really for perpetuation and continuation of migratory birds and waterfowling, winter waterfowling in particular, that is really our reason for going to Reelfoot and that is still our long-term objective and our real concern is to provide for migratory birds.

However, we're on approximately a third of the entire lake. From the standpoint of people use, our public use activities, the overwhelming use at Reelfoot is directed at sports fishing. And, of course, we're not oblivious to the desire of the public to use the lake, and, in fact, we encourage and have our own public use purpose, and approximately 70 to 80 percent of our own refuge visitors each year comes by way of sports fishing.

So, we, more or less, encourage those but not, not at the expense of looking after what we consider our mandated responsibilities, which is waterfowl management.

In other words, if we can have our cake and eat it, too, we encourage the sports fishermen, but if our use starts infringing on our primary objectives or waterfowl management, then we do begin to curtail that use on the refuge.

But we, well, we try to protect our primary purposes, but we would cooperate with anyone, private or another public agency, to try to, well, help the local economy or help the fisheries resources.

So, we normally look to the State as the primary fishery management agency.

\* \* \*

Q. Tell me again what was your input or your agency's input into this state developed plan that led to this decision for the drawdown that we are concerned about now?

A. All right. Are you speaking of the technical committee or their environmental assessment type document, Your Honor?

Q. Well, I think that I am thinking about both. I am concerned overall with what was the federal input, what part did the Federal Government play in the development of the technical aspect or any other aspect insofar as leading up to the ultimate decision that this drawdown is an advantageous undertaking even though, as you put it, it may have some short-term adverse effects.

A. All right. So far as the technical committee's input, of course this was set up or formed at the, more or less, at the direction or at the request of TWRA. And to the best of my knowledge they didn't really ask the other agencies involved, well, what did we think about a drawdown. They, more or less, advised us that they indeed planned one and sort of give us a timetable, and then from that point on they asked us, well, for any input, suggestion, recommendation, data, either before, during or after the drawdown that we might be interested or that they thought that we felt would be needed to be collected for future reference in case they saw the need for future drawdowns, which they thought that they would probably need to do future ones on, I believe they state, a seven to ten year interval.

Of course, well, as a biologist this drawdown would present an opportunity to collect many kinds of biological data which would be valuable to us and to other wildlife or interested agencies an opportunity that is not normally there so far as as the controlling of vegetation, increasing or decreasing wildlife, food plants and things like this.

But our input there, we had the, well, we had the opportunity to express our opinions and ask for studies or say that we would be able to help with certain studies, but there was nothing binding on us.

In further support of its position in this lawsuit, the Court finds there are too many citizens concerns left unsatisfactorily answered by the state's decision on the 5.8 feet drawdown of Reelfoot Lake. Those concerns are listed on page 3 of the State's assessment of impacts of a proposed water level management program for Reelfoot Lake. That assessment is entitled, Reelfoot Lake An Assessment for Water Level Management, April, 1985. Those concerns are:

1. Will low water make water quality worse?
2. Will all of the fish die?
3. How will fish get back in the lake if they all die?
4. Will there be water in the lake during the waterfowl season?
5. Will there be an offensive odor from decaying vegetation and fish?
6. How will water get back in the lake?
7. Will there be an increase of lead shot ingested by waterfowl?
8. Where will all the waterfowl go?
9. Will cropland be flooded around the lake?
10. What measures will be taken to help prevent downstream flooding of cropland when water is released?
11. Will the loss of aesthetic qualities offend visitors?
12. Will there be a loss of fishing opportunity?
13. Will recreational businesses loose revenue?
14. What will happen to the eagles?
15. Will the drawdown disturb the New Madrid fault?
16. Will drawdown kill the cypress trees?
17. Will willows invade the lake?
18. Will water manipulation help control noxious weeds?
19. Can commercial fishing continue during drawdown?
20. How will lake users gain access to the lake?

The state's efforts in recognizing the urgent need for water quality management at Reelfoot Lake are commendable. These efforts represent a very fine and substantial beginning in the right direction. While it is not necessary for a resolution of the issue in this lawsuit, the Court will go on

and say it is not the state's obligation to go it alone at Reelfoot Lake. The United States has a definite responsibility and it ought to, in good conscience and in keeping with its contractual duties and obligations under the lease, go forward with that responsibility, perhaps jointly with the State of Tennessee to insure the future of Reelfoot Lake.

The State of Tennessee is taking on virtually a no money project at Reelfoot Lake. Just because it does not cost any money to drawdown the water 5.8 feet at Reelfoot and just because it does not cost any money to expose the lake bed and substrate to the sun, there may be a substantial cost in such areas as lake size, fish kill, loss of wildlife, and economic adversity to the Reelfoot Lake communities.

It is not sufficient, in the Court's opinion, to rely on natural rainfall to guarantee the return of the water in Reelfoot Lake if the 5.8 feet drawdown is permitted to continue. There is no guarantee rainfall will replenish the water. It may but it is not certain. The evidence in the record in this case indicates there are other ways not dependent on nature alone. Those ways should be further explored. Waters of the Mississippi River are available to replenish the waters at Reelfoot. All that is required are concern, resolve, commitment, funds and a will to do.

A plain reading of the lease shows the United States has a duty to control vegetation growth in Reelfoot Lake. The lease gives the United States authority to drain the lake sufficiently to control such growth. A reasonable inference is this authority was given the United States, if approved by the State of Tennessee, to guarantee the quality of water flowing from areas of Reelfoot Lake supplying water to the federal wildlife refuge. This would guarantee the quality of water for refuge purposes and for state fishing purposes. No other interpretation of the lease would make any sense. The State of Tennessee, in its generosity, reserved only two conditions in the lease 1) the right of its citizens

to fish in the lake with hook and line and 2) the right to sell licenses for that purpose.

Listening to the witnesses who testified during the hearing of this lawsuit, and hearing their various areas of exertise, the Court concluded the United States and the State of Tennessee have the power, the expertise and the capability to make decisions about water management at Reelfoot Lake based upon state of the art techonology and not upon suppositions or superficial findings such as 1) we do not think there will be a major fish kill, 2) we do not think this will affect the eagles, 3) we do not think willows and cypress will grow up in the drying lake bed, 4) we think we can maintain sufficient water for the refuge, 5) we do not think damage will be beyond redemption 6) if the worst occurs wild birds are highly mobile and they can just move to other places.

In summary, this is a major federal action. The drawdown cannot proceed. An evironmental impact study must be undertaken.

FINDINGS OF FACT

1. The plaintiffs are eleven (11) citizens of Tennessee and Kentucky and include the owners of businesses and farms in the vicinity of Reelfoot Lake and the County Executive of Lake County, Tennessee in his individual capacity. The plaintiffs reside adjacent to or in the vicinity of Reelfoot Lake and use and recreate in its waters.

2. Reelfoot Lake was formed by the New Madrid earthquakes of 1811–12. At its normal pool level of 282.2 feet above sea level, the lake is approximately 15,500 acres in size, with approximately 13,000 of open water. The lake is the only natural lake of major size in Tennessee and is widely known for its scenic beauty, waterfowl, hunting, fishing, and as a major wintering area for golden and bald eagles, ducks, geese, and other migratory waterfowl.

3. The state of Tennessee owns approximately 24,339 acres in and around the lake of which 279.23 acres is administered for public use by the Tennessee Department of Conservation and 7,860 acres is leased to

the U.S. Fish and Wildlife Service. The remainder of State land is operated by the Tennessee Wildlife Resources Agency as the Reelfoot State Wildlife Management Area. The property leased to the Fish and Wildlife Service and a small amount of land in Tennessee and 2,300 acres in Kentucky, owned by the Service in fee simple is operated by the Service as the Reelfoot National Wildlife Refuge. The level of the water is controlled by gates at the spillway located at the south end of the lake, through which water passes into the spillway ditch, thence into the Obion River which empties into the Mississippi River.

4. On August 28, 1941, the State of Tennessee, acting through the Reelfoot Lake Commission, leased 7,860 acres to the Service for 75 years. This together with 2,300 adjacent acres in Kentucky has been consistently maintained by the Service as the Reelfoot National Wildlife Refuge. The leased property includes the spillway and the gates which control the water level of the lake.

5. The lease states that the Service "shall maintain and operate" the "dams and spillways". (Exhibit 10, paragraph 5). The spillway structure is leased to the Service until August 1, 2016. No reference is made in the lease to any right of the State to operate the spillway or control the water level of the lake.

6. The State reserved two rights in the lease: the right to collect fees and the right to fish. No express reservation of right to regulate water levels was made by the State in paragraph 4 of the lease.

7. In the 1942–1943 Water Management Plan prepared by the Service, it is stated that "the Government assumed control over the lake level" under the 1941 lease

8. Between August 28, 1941 and May 24, 1985, the State did not open or close the spillway gates.

9. The Service has conducted several prior drawdowns in response to requests made by the State to improve fisheries in the lake. In 1976, Mr. Harvey Bray, TWRA, requested Mr. Crews of the Service to lower the lake twelve (12″) inches. Mr. Crews forwarded the request to the Fish & Wildlife Service, Atlanta Office, noting for his Regional Director that the State "seeks our cooperation because, by long term agreement, we control the water level of the lake." Similar requests were made in 1978, 1979 and 1980.

10. Reelfoot Lake has major problems with both inorganic and organic siltation. The organic siltation at Reelfoot Lake is the result of the lake's hypereutrophic condition. The lake waters are super-fertile and overly-rich in nutrients which causes a tremendous amount of plant growth in the water. These plants consume large amounts of oxygen, especially at night and on cloudy days, thus reducing the amount available to fish and other aquatic animal life. This problem is compounded because oxygen is also used in the decomposition of this plant life as it settles to the bottom of the lake. The decomposition of unusually large amounts of organic matter further enriches the nutrient levels of the lake.

11. In addition, the decomposition of organic matter has caused a layer of decaying vegetative "muck" to accumulate on much of the lake bed, reducing the areas preferred by sport fish for spawning.

12. The TWRA drawdown project was conceived as an effort to combat the twin problems of depleted oxygen levels and reduce sport fish spawning habitat. It is a fact, the state claims, exposing 50% of the lakebed to the drying action of the sun and wind for 90–120 days will allow the organic deposits to dry, compact, reoxygenate, and more fully decompose. This will, in turn, improve oxygen levels once the lake is refilled and will improve sport fishing spawning habitat. In a sense, the drawdown is an attempt to imitate the natural climatic-influenced cycles which occur regularly in an unregulated lake and which occurred at Reelfoot Lake prior to man's regulation of the lake levels by construction of levies and other water control structures.

13. The genesis of the drawdown project can be traced to 1982 when, according to Gary T. Myers, TWRA Executive

Director, his agency decided to depart from a past practice of relatively passive management of the lake and to aggressively approach management and preservation plans for Reelfoot Lake. He created five committees, consisting primarily of TWRA employees, to develop a management plan for Reelfoot Lake.

14. In 1983, by House Joint Resolution No. 24, the Tennessee General Assembly created a ten-member Reelfoot Lake Legislative Task Force to study the management, preservation, and development of Reelfoot Lake.

15. In October, 1983, the Legislative Task Force directed the TWRA to develop a water management plan for Reelfoot Lake by June 1984. Jim Johnson, TWRA project leader for the Reelfoot Lake drawdown, Harold Hurst, TWRA Region I Director, and Gary Myers, TWRA Executive Director, testified that after two months of investigation by TWRA staff, including an on-site consultation by Florida game and fish officials, TWRA staff recommended in June, 1984 that an extreme summer drawdown begin at Reelfoot Lake in June of 1985. The Tennessee Wildlife Resource Commission and the Legislative Task Force were informed of the project in the summer of 1984.

16. In 1984, the Tennessee Legislature designated TWRA as the lead agency to direct activities at Reelfoot Lake. T.C.A. §§ 11–14–116; 70–1–206(6); 70–1–302(d). As such, the TWRA has succeeded the Tennessee Department of Conservation for purposes of the 1941 lease.

17. Public notice of the drawdown proposal was given in June, 1984 and public comment encouraged. In August, 1984, TWRA met with interested citizens and the agency established an ad hoc Reelfoot Lake Technical Committee. This committee was composed of technical experts and specialists from various state, federal, and private agencies, and local citizens. The committee had no authority to make policy or decisions, but served as an information-sharing and advisory group to the TWRA project leader.

18. Four government agencies (The FWS, The Corps of Engineers, the Soil Conservation Service and the U.S. Geological Survey) participated on a technical committee, with federal employees providing thirty-seven (37%) percent of the initial members on this committee.

19. In December, 1984, TWRA Executive Gary Myers instructed project manager Jim Johnson to do an environmental study of the drawdown and its effects on Reelfoot Lake. The study was a product of the work of Mr. Johnson who sought advice and input from various state and federal personnel and other specialists in his evaluation of the impact of the drawdown on the lake.

20. A rough draft of the study was sent to the members of the technical committee and others for comment in February, 1984. A final study was published in late April or early May, 1985 and public hearings were held on May 7, 8 and 9 at Reelfoot Lake, Dyersburg, and Tiptonville.

21. In 1985, the Tennessee Legislature passed a statute giving the executive director of TWRA exclusive control over the water level in Reelfoot Lake. 1985 Tenn. Pub.Acts Ch. 350, § 11. The Legislature also approved a $3.5 million appropriation for Reelfoot Lake in the TWRA's 1985–86 fiscal year budget.

22. At the May 17, 1985 Tennessee Wildlife Resources Commission meeting and public hearing held to consider TWRA's proposal, citizens and others raised their questions regarding the drawdown.

23. On May 24 and 27, 1985, the TWRA began an extreme drawdown of the lake through the spillway gates.

24. On May 24, 1985, the State opened the gates for the first time. The large radial gate was opened on May 27, 1985 by the State. The State intends to draw the lake down one-tenth ($\frac{1}{10}$) of a foot a day until fifty (50%) percent of the lake is exposed. The best estimate at this time is that a drawdown of 5.8 feet will be necessary to achieve this objective.

25. To open the small gates, it was necessary for Mr. Brown of the TWRA to secure a crank from the Service. The State did not have a crank. Mr. Brown, as well as the Service employee who gave the crank to Mr. Brown, were acting on orders from their respective superiors.

26. To open the large radial gate, it was necessary for the TWRA to secure a specially designed machine owned by the Service. The State did not have one.

27. Mr. Brown took the Service's crank to Mr. Ballinger, a blacksmith to be copied. He picked up the new crank on May 28, 1985 and paid Mr. Ballinger $15.50.

28. Refill of the lake is scheduled to begin on November 1, 1985. The lake is expected to refill to normal pools (282.2) from a surface elevation of 276.4 feet in January 1986, in a normal climate year.

29. The drawdown of 5.8 feet will reduce available water by about seventy-five percent at maximum drawdown. At an elevation of 276 feet above sea level, thirty percent of the area will have water with a depth of one foot or less and fifty seven percent would have a depth of two feet or less.

30. The drawdown will drain a substantial portion of the water from the National Wildlife Refuge.

31. During the drawdown, animals may be adversely affected in a variety of ways:

    a. Aquatic animals stranded in shallow pools may die as water evaporates around them.

    b. Animals may temporarily lose their feeding habitat.

    c. Animals may temporarily lose their reproductive habitat.

    d. Animals may be stressed or die from low oxygen levels."

32. [R]ecreational opportunities in and around Reelfoot Lake will be adversely impacted during the holddown period of the restoration project. Lack of access to the remaining 6,000 acres of water will be the main limiting factor to recreational use. Access will be a problem after the lake drops approximately 18 inches from normal pool.

33. Many conditions during the project will be aesthetically unappealing—possible fish kills, decaying biomass, exposed muck bottom, unconventional access and an exposed lake bottom.

34. The State has admitted that the drawdown will have significant affects on the human environment.

## CONCLUSIONS OF LAW

This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 and venue properly lies in this Court. The plaintiffs have standing to maintain this action. *See Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

Congress, in 1969, passed the National Environmental Policy Act (NEPA) which declared a national policy to "encourage productive and enjoyable harmony between man and his environment" 42 U.S.C. § 4321. Additionally, this statutory scheme recognizes a "continuing" responsibility of the federal government to "use all practicable means and measures ... to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the second and future generations of Americans." *Id.*

The procedural mechanism necessary to carry out this policy is contained in 42 U.S.C. § 4332. Section 4332(C), which represents the mainspring of the procedural mechanism, provides all federal agencies shall:

Include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

    (i) the environmental impact of the proposed action,

    (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

    (iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

The defendants contend none of their actions in connection with the drawdown on Reelfoot Lake constitutes "major federal action" as required by NEPA. However, as previously discussed, the Court believes that merely focusing on the drawdown presents too myopic a view because it totally ignores the larger historical background of Reelfoot Lake. The evidence adduced at trial irrefutably supports the conclusion that the present drawdown merely constitutes a single action which must be viewed against the larger backdrop of 44 years of continuous and exclusive federal water level management of Reelfoot Lake. The Court finds that this continuous and exclusive federal control and management of the lake constitutes a "major federal action."

Even though NEPA may not be applied retroactively, Courts have construed its terms to be applicable to ongoing federal projects commenced prior to January 1, 1970 when substantial federal actions are yet to be taken after the effective date of the Act. *Citizens Organized to Defend Environment, Inc. v. Volpe,* 353 F.Supp. 520, 538 (S.D.Ohio 1972 (citations omitted). Thus, such application is limited to major federal actions as to projects where such actions constitute substantial changes, after January 1, 1970, in decisions theretofore made or in actions theretofore undertaken. *League of Women Voters of Tulsa Inc. v. United States Corps of Engineers,* 730 F.2d 579, 584 (10th Cir.1984).

"Major federal action" has been defined judicially and in terms of such requirements as "substantial planning, time, resources, or expenditure." *City of Blue Ash v. McLucas,* 596 F.2d 709, 712 (6th Cir.1979) (citations omitted). The applicable regulations also state that such actions include "systematic and connected agency decisions allocating agency resources to implement a specific statutory program." 40 C.F.R. § 1508.18(3).

The record reflects that the Department of the Interior, pursuant to the Migratory Bird Conservation Act, was authorized to purchase or rent land for use as involate sanctuaries for migratory birds 16 U.S.C. § 715d. On August 28, 1941, the State of Tennessee and the Department of Interior, Fish and Wildlife Service (Service) entered into a lease agreement wherein the state leased 7,860 acres to the Service for 75 years for the purpose of establishing a wildlife refuge.

The Court has already found that the lease agreement is not ambiguous and will not here reiterate its analysis. The Court finds that under the lease agreement the Service possessed the sole legal authority to manipulate the water level at the lake. This authority was only bounded by the restriction that if the Service wished to manipulate the water level either three feet above or below the normal pool level which was 282.2 feet above sea level, the Service must obtain the written permission of the Commissioners of Conservation of the State of Tennessee, or his successor, approved by the Governor of Tennessee.

The evidence of record shows that since the signing of the lease agreement, the Service has expended substantial planning, time, resources, personnel and money to establish and maintain a wildlife refuge of national significance on Reelfoot Lake. Thus, there has been a continuous and extensive federal presence on the lake for some 44 years.

There was testimony at the trial which indicated that drawdowns had occurred previously on the lake. Each time, a request was made to the Service and a detailed study was done to determine if there would be an adverse impact. The mechanisms necessary to manipulate the water level had continuously been in the possession of the Service and Service employees had always manipulated the water level on the lake until this present drawdown was begun.

The Court finds that the Service's uninterrupted allocation of funds, resources, planning, personnel and time to the refuge at Reelfoot so that its obligations under the 1941 lease agreement and the Migratory Bird Conservation Act could be carried out constitute a major federal action as to an ongoing federal project. Moreover, the Court finds that the Service's acquiescence in the drawdown and relinquishment of the mechanisms necessary to effect the manipulation of the water level constitute an abandonment of the Services obligations and represents a substantial change in decisions heretofore made or in actions theretofore undertaken.

## SUMMARY

Stated succinctly, the issue in this lawsuit is not simply whether the limited federal participation in the state's drawdown of 5.8 feet of water at Reelfoot Lake is a major federal action. Instead, the issue is whether the federal government's acquiescence in the state's water drawdown project and actual physical relinquishment of its possession to the state of the mechanisms (key and crank) necessary to control the water pool level, acts of the federal government constituting what appears to be an abdication of its duties and responsibilities under the federal Migratory Bird Conservation Act.

The Court finds the terms of the 1941 lease agreement between the state of Tennessee and the Service whereby the Service, pursuant to the Migratory Bird Conservation Act, leased approximately 7,606.-84 acres of land and water to establish an inviolate sanctuary for migratory birds is not ambiguous. Under the terms of the lease, the Service had the sole authority to manipulate the water level at Reelfoot Lake. The Service, in accordance with its obligations under the 1941 lease and the Migratory Bird Conservation Act, exercised uninterrupted and exclusive control over the manipulation of the water level for 44 years. Moreover, the Service continuously throughout this period allocated funds, resources, planning, personnel and time so

that its ongoing obligations under the lease agreement and the Migratory Bird Conservation Act could be carried out with respect to their ongoing project—the Reelfoot Lake National Wildlife Refuge.

The actions of the Service in reference to the refuge at Reelfoot Lake constitute major federal action as to an ongoing federal project. Therefore an environmental impact statement must be prepared in accordance with NEPA before the drawdown can proceed further. However, the Court declines to enter a mandamus because the matter has not been sufficiently litigated. Additionally, the Court is of the opinion it is not necessary to consider a mandamus at this point to compel the Secretary to carry out a function of his office.

In conclusion the Court expresses its thanks and appreciation to all of the attorneys for the excellent manner in which this case was presented to the Court.

It is so ORDERED.